**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **INDECK POWER EQUIPMENT**<br>**COMPANY, an Illinois corporation,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  03 C 7494** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **RING POWER CORPORATION, a Florida** | ) | |
| **Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

On October 23, 2003, Defendant Ring Power Company filed a notice of removal of

Plaintiff Indeck Power Equipment Company's original complaint, filed in the Circuit Court of

Cook County.  Plaintiff filed an amended three-count complaint in this Court on May 19, 2004.

Count I alleged consumer fraud and deceptive business practices in connection with a 1999

purchase of a 1750 KW generator set.  Count II alleged that Defendant breached an express

warranty made in connection with the 2001 purchase of 24 XQ 2000 generator sets.  Count III

requested the remedy of reformation in connection with the 2001 purchase.

By order dated January 25, 2005, this Court granted summary judgment in favor of Ring

Power as to Count I.  *See January 25, 2005 Memorandum Opinion and Order.*  As for Counts II

and III, however, this Court found that significant factual issues remained.  Consequently, those

claims were set for trial.  On February 28, 2005, a bench trial proceeded on those claims.

At the close of trial, both parties submitted post-trial memoranda on the subject of liability. Based on the trial, and parties' pre-trial and post-trial submissions, the Court makes the following findings of fact and conclusions of law. To the extent that any findings may be deemed conclusions of law, they shall also be considered conclusions. To the extent that any conclusions may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

**FINDINGS OF FACT**

*The Parties*

1.     Plaintiff Indeck Power Equipment Company ("Indeck") is an Illinois corporation with its principal offices in Wheeling, Illinois.

2.     Plaintiff is in the business of buying and leasing power plant equipment.

3.     Defendant Ring Power Corporation is a Florida corporation with its principal offices in Jacksonville, Florida.

4.     Defendant is in the business of, among other things, selling and leasing power plant equipment.

5.     Defendant is an authorized Caterpillar, Inc. ("Caterpillar") machinery dealer.

6.     The business transaction at issue in this case was triggered by an energy shortage on the West Coast in 2001.

7.     Plaintiff's CEO and Chairman Gerald Forsythe ("Forsythe") wanted to capitalize on the shortage by purchasing diesel generator sets and leasing them to utilities.  The utilities that leased the sets could use them to generate additional power.  Defendant had a similar plan and had already sent between twenty and thirty generator sets to the West Coast by the time that the events that are the subject of this litigation took place.

8.     A generator set is a piece of power generation equipment.  A "power module" is generator set in a container.  The term generator is sometimes used as a short hand way of saying generator set or power module.

9.     Forsythe had heard and seen the term "utility grade" used in connection with generator sets, including sets made by companies other than Caterpillar.

10.    Forsythe understood utility grade to mean capable of paralleling with utilities.

11.    In March of 2001, Forsythe did not know the Caterpillar-specific terminology that was used for any of Caterpillar's generator items, models, or units, but expected to purchase equipment that could parallel with utilities.

12.    Prior to 1997, Caterpillar made generator sets with two different types of switchgear–the company referred to one type as "Standard Grade" ("SG") switchgear and the other type

as "Utility Grade" ("UG") switchgear.  The latter had more features, was more complex, and could be used by utilities.

13.  In light of the increasing demand for generators that could be rented to utilities, Caterpillar created a switchgear that did not have the full features of the UG switchgear but could still safely link to utilities.  Caterpillar refers to that switchgear as "Utility Convertible" ("U C").  Like UG switchgear, it can safely parallel with utilities.  The UG module is better suited to permanent installations while the UC module was specifically designed for rental applications.

14.  Switchgear is housed in a power module.  Caterpillar describes UC power modules as those that contain automatic paralleling switchgear and have supplemental "Utility Conversion panels" which allow the UC modules to be used for more complex utility paralleling applications.  In contrast, UG modules contain switchgear that is intended for either automatic or manual paralleling with a utility and do not have the panels.

15.  The UC module is easier to transport than the UG module because it has a fixed mount circuit breaker as opposed to a draw-out circuit breaker.  It also comes with two less protective relays.  It cannot be customized in the same way as a UG module.

16.  The UC module is significantly cheaper than the UG module.  At trial, the testimony suggested that at the time of the transaction the price difference may have been about $80,000 per unit.

17.    Forsythe did not know that Caterpillar had two different types of generator sets capable of paralleling with utilities.  He had previously purchased power modules that could parallel with utilities.  He did not expect the Caterpillar equipment he was about to purchase to be identical to that previous purchase but did expect it to be "utility grade."

*Trade Usage of the Term "Utility Grade"*

18.    Bana Dominick, a former employee of Plaintiff, testified that on numerous occasions he had heard and used the term utility grade as a descriptive term for generator sets that could parallel to a utility.  Dominick testified that he had managed projects where "many times" a utility convertible model had been successfully paralleled to a utility.

19.    Both Schultz and Forsythe understood the term utility grade to mean capable of paralleling with utilities.  That was also the definition used in the industry.

*The March 7, 2001 Phone Conversation and Subsequent Transaction*

20.    On or about March 7, 2001, Forsythe contacted Lyndon Schultz, an assistant used engines sales manager for Defendant.

21.    Forsythe told Schultz that he was looking to purchase used generator sets that he could rent to utilities.  He said he was looking to purchase those sets as quickly as possible.

22.    Forsythe asked Schultz if the sets listed in a Ring brochure were available.  That brochure did not use the word "convertible" to describe power modules

23.     Schultz replied that those specific sets were not available but that Defendant had units on order from Caterpillar that were consistent with the units in the brochure.

24.     Other than using the term "utility grade," Forsythe did not further specify what particular switchgear devices he wanted. He did not tell Schultz that he wanted a draw-out circuit breaker. He did not know what switchgear was involved and said, "[t]he statement utility grade was satisfactory to me."

25.     Subsequent to that conversation, Shultz sent Forsythe a quotation for eight new Caterpillar power modules.

26.     The quotation referred to generators that were "SOUND ATTENUATED, UTILITY GRADE, 3516B-DITA DIESEL POWER, POWER MODULES WITH CHASSIS, RATED 2000KW...". Each generator was to have "CAT CONVERTIBLE UTILITY GRADE PANELS WITH AUTO- PARALLELING SWITCHGEAR."

27.     Between the time when Schultz sent the March 7, 2001 quote and when Forsythe agreed to purchase the units, Forsythe did not make any inquiries to Ring Power as to what the specification "CAT CONVERTIBLE UTILITY GRADE PANELS WITH AUTO- PARALLELING SWITCHGEAR" meant.

28.     Forsythe agreed to purchase those power modules and Plaintiff's representatives then drafted the purchase orders. Plaintiff paid a premium on the machines.

29.     The orders were for the purchase of *"NEW CATERPILLAR XQ2000, TRAILER GENERATOR."*  The purchase orders described the generators as "SOUND ATTENUATED, UTILITY GRADE, 3516B-DITA DIESEL POWER POWER MODULES WITH CHASSIS, RATED 2000KW..." with "-CAT CONVERTIBLE UTILITY GRADE PANELS WITH AUTO PARALLELING -SWITCHGEAR.*"

*30.*    Forsythe did not intend for there to be any change between the language of the quote and the purchase order.  The dash between the words "paralleling" and "switchgear" in the purchase order was not intended to be a substantive change.

*31.*    At the time of ordering, Mr. Forsythe was aware of the inclusion of the phrase "CAT CONVERTIBLE UTILITY GRADE PANELS WITH AUTO-PARALLELING SWITCHGEAR" in the March 7, 2001 quote.

*32.*    Forsythe did not know what the word "convertible" meant and did not try to find out what it meant.

33.     Forsythe and Schultz did not discuss the meaning of that language specifically, but did discuss how the generators would meet Forsythe's needs.

*34.*    Paragraph 19 of the purchase orders states that the order shall be construed and interpreted in according with Illinois law.  Paragraph 19 also states that any court action between the parties shall be initiated in the state or federal courts with jurisdiction over Lake or Cook counties.

*35.*     Forsythe testified that at the time in question:  "Everybody was in the rush to get a quote to me and we were in a rush to get purchase orders to them..."

*36.*     The orders were issued on March 8, 2001.  They included the language :"IN THE EVENT THAT THE SHIPMENT IS DELAYED FOR ANY REASON RINGPOWER SYSTEMS WILL PAY $1000.00 PER DAY PENALTY TO INDECK."  The delivery date specified on the orders was July 30, 2001.

*The Subsequent Transaction and Related Conversations*

37.     Plaintiff issued to Defendant another 16 purchase orders on March 16, 2001.  Those orders used virtually the same language as the orders of the previous transaction.

38.     The purchase orders for all 24 Generator Sets used the terms "NEW CATERPILLAR XQ2000, TRAILER GENERATOR SOUND ATTENUATED, UTILITY GRADE, 3516B-DITA DIESEL POWER MODULES WITH…CAT CONVERTIBLE UTILITY GRADE PANELS WITH AUTO PARALLELING -SWITCHGEAR."

*39.*     The purchase orders also included language requiring Defendant to pay Plaintiff one thousand dollars for every day that the shipment was delayed.  The delivery date was August 30, 2001.

40.     Marsha Forsythe-Fournier, Plaintiff's president and chief operating officer, stated that on or between March 16, 2001 and March 19, 2001 she contacted Schultz about the specifications and emissions data on those units so that she could determine if they would fit the needs of one of her potential clients. She testified that Schultz told her that

-8-

Forsythe had ordered utility grade units that would meet emission requirements. She testified that she did not discuss the switchgear with Schultz.

41.     Jay Moser, one of Plaintiff's employees, contacted Schultz on or about March 19, 2001. Moser said that he requested specifications and emissions data about the machines Forsythe was ordering from Schultz. Schultz's testimony indicates that he does not remember whether the conversation concerned the machines already ordered or other machines. Schultz testified that Moser requested emissions data. The emissions profiles for both UG modules and UC modules are the same.

42.     One of Defendant's employees then sent Moser a specifications sheet for a UG module. That fax, sent on March 19, 2001, included emissions data. Moser passed it along to Forsythe-Fournier. Over the next week or so, Moser was in contact with Schultz about information he needed for two potential deals.

43.     On March 23, 2001, Moser asked Schultz if the units they were discussing had draw-out circuit breakers. Plaintiff's phone records indicated that someone used Plaintiff's phone line to call someone at Defendant's phone number on that date. Moser was not convinced at the time that the units he was discussing with Schultz were the same as the units for which he had received specifications or the same as the units that Forsythe was ordering.

44.     After receiving the orders, the manager of Defendant's power division, Jim Rockenbach, decided that he and Schultz needed to speak with Forsythe. He wanted to carry out an in-

depth conversation with Forsythe because he was worried that Forsythe would renege on the deal.

45.     Unlike the previous transaction, which involved power modules that Defendant already had on order, this transaction required Defendant to order more modules from Caterpillar solely for the purpose of selling them to Plaintiff.  Rockenbach was concerned that Defendant would have to absorb the cost of the generators if they were ordered and Plaintiff decided not to continue with the deal.

46.     Forsythe spoke with Schultz and Rockenbach on March 20, 2001.  He again emphasized that he wanted to order power modules that could parallel with utilities and wanted them as soon as possible.

47.     Rockenbach went over the purchase order, line by line, with Forsythe and Schultz.  He detailed the specific capacity of the generators in question.

48.     Rockenbach did not explicitly explain the difference between the UC and UG modules, but rather focused on why he thought the particular modules that Forsythe was ordering–modules with convertible utility grade panels and auto-paralleling switchgear–were the right match for Forsythe's needs.  He specifically mentioned the circuit breaker and the conversion panels.

49.     Rockenbach testified at trial that in response to the West Coast crisis, Defendant had between twenty and thirty UC modules without any modifications that were paralleling

with utilities.  He also testified that over the years, Defendant had paralleled UC modules with other utilities.

50.    Rockenbach had heard from one of Defendant's employees that some utilities on the West Coast were requiring modifications to the UC modules they were renting. He testified that he did not find that statement troubling in light of his own experiences and did not mention it to Forsythe.

51.    Before it would pay for the modules, Plaintiff demanded that Defendant make changes to them, including adding latches, caulking, re-rigging some hoses under the containers, and painting wheels.  Plaintiff sent inspectors to determine whether the changes had been made.

52.    Defendant made all of the changes requested by Plaintiff.  Plaintiff paid for the modules and took possession of them.

53.    Plaintiff paid Defendant in excess of $15,505,000 for the twenty-four Caterpillar power modules.

54.    Plaintiff received the generator sets and accompanying product manuals in 2001.  The manuals, titled "Operations Manual: Utility Conversion Panels," described how the switchgear that is a component of the Caterpillar UC model functioned.

55.   After Plaintiff received the units, it was not able to immediately rent them out because demand for the machines had softened.

56.   Forsythe-Fournier testified that in response to the change in market conditions Plaintiff hired Bana Dominick in January 2002 to market generators in Plaintiff's fleet.

57.   After Dominick saw the fleet that Plaintiff had purchased from Defendant, he told Forsythe Fournier that Plaintiff had paid too much for them.  He said that they were UC power modules rather than UG power modules.

58.   Forsythe-Fournier asked Dominick to get written information on the topic.  She testified that a month or two later, he provided her with a "systems sheet" from Caterpillar that distinguished between the two types of generators.

59.   Dominick received the sheet from Fiorito, who was then working for Caterpillar.  He received the sheet by fax a few minutes after he requested it from Fiorito.  Both Fiorito and Dominick testified that he only requested and received the sheet once.  Dominick testified that he gave Forsythe-Fournier the systems sheet the day after he initially told her that she had gotten the wrong power modules.

60.   Along with demanding the sheet, Forsythe-Fournier also searched the internet and found no information on differences between the two.

61.     Forsythe-Fournier testified that she misplaced the sheet once Dominick gave it to her. She said that probably a month or a month or two after she had misplaced the document, she asked Dominick to get her another copy. She stated that Dominick said he also no longer had a copy of the sheet and would need to get another copy.

62.     She testified that he eventually got her another copy.  She said she then did more internal research.

63.     Eventually, on September 4, 2002, she sent Defendant a letter stating that they had not delivered the correct machines.

64.     Plaintiff rented the Generator Sets in both 2003 and 2004 and had  obtained $1,634,768.08 in rentals on the 24 generator sets at the time of trial.

**CONCLUSIONS OF LAW**

In order to recover for a breach of contract under Illinois law, a plaintiff must prove the existence of a contract between the parties, performance by the plaintiff of the conditions imposed on him by the contract, breach of the contract by the defendant, and the existence of damages as a result of the breach.  *See, e.g., Payne v Mill Race Inn*, 504 N.E.2d 193, 196 (Ill. App. Ct. 1987).  Proof of liability is complete when the breach of contract is shown.  *Hydrite Chemical Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir. 1995) (citation omitted).

The parties dispute whether Defendant breached the contract and whether damages exist as a result of such a breach.  Defendant contends that it did not breach the contract because it provided the products that Plaintiff ordered: generator sets that were "utility grade" in the sense

that they could parallel with utilities. Defendant argues that the parties agreed that Ring would sell Indeck a type of Caterpillar generator that could parallel with utilities and contained convertible panels. The Caterpillar generator that fits both criteria, according to Defendant, is the UC power module.

Plaintiff counters that Defendant did not provide it with the generators it ordered. According to Plaintiff, by stating that he wanted "utility grade" power modules, Forsythe was indicating that he wanted UG power modules. Despite the fact that Forsythe admits that did not know the difference between UG and UC power modules, Plaintiff contends that he wanted UG modules instead of UC modules.

When the written contract is unclear "any evidence admissible under the rules of evidence is usable to establish the contract's meaning." *Joy v. Hay Group*, 403 F.3d 875, 878 (7th Cir. 2005)(citations omitted). Furthermore, "when interpreting a contract as a whole, courts should remain sensitive to the contract's commercial context." *Bristow v. Drake Street Inc*., 41 F.3d 345, 352 (7th Cir. 1994)(citations omitted).

The meaning of an ambiguous term may be established by offering evidence of its trade usage. *See Advance Process Supply Co. V. Litton Industries Credit Corp.*, 745 F.2d 1076, 1079 fn. 6 (7th Cir. 1984). "[U]sage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts." 810 ILCS 5/1-205.

The Seventh Circuit has observed that "[t]he difference between evidence of trade usage and testimony by a party to the idiosyncratic meanings that he and his opponent attached (he

says) to the words they used when they were negotiating the contract is that evidence of trade usage is objectively verifiable. It is evidence about what words, phrases, etc. mean to a community, not merely to a pair of individuals; it is evidence about a public, not a private, language–evidence that is the equivalent, really, of a specialized dictionary." *Bristow, 41* F.3d at 352 (7th Cir. 1994)(citing *In re Envirodyne Industries, Inc.,* 29 F.3d 301, 305 (7th Cir.1994)).

At the outset, this Court must acknowledge that this is a case that appears, based on the briefing and record, to be far more complicated than it actually is. At its most basic, this case involves the question of whether Forsythe received the power modules that he ordered. The contracts use the term "utility grade" to describe the module and also include descriptions of panels that are found on a specific type of module that can parallel with utilities. The industry use of the term "utility grade" is a machine that can parallel with utilities. The machines that Forsythe received can do that. Various witnesses testified that throughout their time in the industry, they had used the term and heard the term used to describe any module that could parallel with utilities. Forsythe testified that throughout the transaction he thought that a utility grade module was one that could be rented to utilities. Schultz testified that he considered utility grade to mean a module that could parallel to utilities.

The case becomes more complicated, however, because the term "utility grade" was also used by Caterpillar to describe a specific model–the original module it offered that parallels to utilities. After the introduction of the UC module in 1997, Caterpillar had on the market two different machines that could parallel with utilities. The uses for each machine were different–one model was easier to transport and was better for rental applications while the other was better for more permanent applications. Caterpillar referred to the former as a "utility

convertible" machine and the latter as a "utility grade" machine. As Rockenbach notes, Caterpillar broke with the common understanding of the words utility grade when it referred to one model that could parallel with utilities as a UG power module and the other as UC power module.

Before hearing this case, this Court expressed doubts with respect to the argument that there existed a generic term utility grade that could encompass both UC and UG power modules. These doubts were based, in part, on the sheer confusion that resulted from reading the briefing and accompanying deposition testimony. As noted in the summary judgment order, the record was neither a paradigm of clarity or civility.[1]

While Plaintiff considers the term utility grade only to refer to the specific UG model and Defendant considers it a term of the trade, it was not possible to ascertain how the witnesses being deposed by counsel viewed the term and how they used it in the conversations at issue in this case. Compounding the problem was the frequent reliance in the briefs on deposition testimony that was taken out of context. A significant amount of time was spent reading testimony that, when reviewed in context, did not actually state the propositions for which it was cited. At the summary judgment stage, Plaintiff managed to create enough confusion with respect to the two meanings that this Court permitted the case to proceed to trial.

---

[1] When asked at trial about his prior testimony, Schultz testified, "My testimony is, sir, when you used the sentence like utility grade or utility convertible, utility grade, I was never really sure what he was talking about, if he was talking about the proper Cat model name or generic term. And there was so much conversation going on [between opposing counsel] regarding this that it was very, very confusing because there was words they had spoken between those two attorneys that when they finally finished what they were saying, I'd have to ask them to repeat the question and, you know, it just–it was hard–it was hard to follow." Having spent extensive time reviewing the various depositions and trial testimony in this case, this Court can certainly understand how a witness could be confused.

The same problems recurred during the review of the post-trial briefs. Rather than highlighting these inaccuracies and the specious arguments they accompany, this Court will focus on what the facts did show at trial.

After having heard the evidence–and having had the opportunity to assess the credibility of the individuals involved in the transaction–this Court concludes that Plaintiff has failed to prove by a preponderance of the evidence that the term utility grade as used in Forsythe's conversation with Schultz and the purchase orders refers to UG power modules only.

Speed was of the essence to this transaction. Forsythe wanted to capitalize on an energy crisis: in order to do so, he needed to get machines that could link up to utilities on the West Coast as quickly as possible. When he called Schultz, he explained the why he needed the machines and why he needed them so quickly. He originally wanted to purchase used machines. He was in such a hurry that he accepted new machines that Defendant already had marked for another use.

Forsythe requested Caterpillar machines because he thought they were good products. He requested utility grade machines because he wanted to be able to service utility clients. That testimony alone is not sufficient to establish by a preponderance of the evidence that Forsythe wanted Caterpillar UG power modules as opposed to Caterpillar UC power modules or that he communicated that to Schultz during a conversation in which he emphasized that he wanted to get machines as quickly as possible.

Notwithstanding Caterpillar's use of the term "utility grade" as a descriptor for a specific type of generator set–the more expensive of the sets in question–it is clear that individuals in the industry refer to any power module that can parallel to utilities as utility grade. Several witnesses

testified that they had used the term "utility grade" in precisely that manner–including Forsythe himself when discussing his conversation with Schultz.

Both Forsythe and Schultz acknowledge that their conversation was about the sale of power modules that could parallel with utilities. The evidence presented confirms that UC power modules can do exactly that. In addition, Dominic Bana, a former Indeck employee, testified that he had successfully managed projects where UC generator sets were paralleled with utilities. Joe Fiorito, another individual with significant experience in the industry, said he had used the term utility grade to describe a UC generator set.

Moreover, Forsythe's own testimony indicates that he did not know the difference between UC and UG generator sets but did know that utility grade machines could parallel with utilities, further supporting Defendant's argument that he was using the term utility grade in the generic sense.

Plaintiff is in the unenviable position of arguing that it did not get a model of utility grade generator that it never bothered to request. Forsythe could not have requested UG power modules as opposed to UC power modules because he did not know enough about the different types to request one as opposed to the other. Instead, he just wanted to get modules that could parallel with utilities and he wanted to get them as quickly as possible so he could capitalize on the energy crisis.

Could Schultz have explained every line of the purchase order in intimate detail? Perhaps. The testimony suggests that he probably did explain to Forsythe how the machines he was getting would meet rental application needs. Could Forsythe have requested a more detailed explanation, especially of terms he did not understand? Certainly. But again, the testimony

makes clear that Forsythe felt it critical to get these modules as quickly as possible. The evidence presented at trial has made clear that this was not a deal that unfolded over an extended period of time by a large staff dedicated to creating the ideal transaction. Schultz spoke with Forsythe, figured out what Forsythe needed, and then did his best to meet Forsythe's needs as quickly as possible.

Plaintiff seems to believe that Defendant had a responsibility for educating Forsythe on the differences between UG and UC generators and that it did not fulfill that responsibility. This Court notes that the evidence does not support an inference that Schultz failed to do that. While his testimony was not without some discrepancies, he was a more credible witness than Forsythe.

In any event, Forsythe is, as his resume and history suggest, an experienced businessman. He accepted the terms of the agreements and agreed to purchase generators with convertible panels. Had he read the contracts and realized that he did not know what convertible panels were, he could have easily called Defendant to ask. Plaintiff had specific requests regarding changes it wanted made to the generators and inspected the generators to assure those changes were made. Surely in that time it would have been possible–even in light of the need for haste–to query what the term "convertible panels" meant. The fact that Forsythe did not is unsurprising–he wanted to get the deals done as quickly as possible so as to make maximum profit renting the power modules during the crisis. That does not mean, however, that Plaintiff has proven by a preponderance of the evidence that Forsythe did not get the generators he ordered.

In addition, this Court finds credible Rockenbach's testimony that he discussed the specifics of the orders with Forsythe before completing the order for the additional 16

generators.  (Rockenbach explained that he was concerned that Plaintiff would renege on the deal; he did not have that concern with the original eight generators because they could have been put to the use for which Defendant originally ordered them).  Plaintiff's counsel emphasized at trial that Rockenbach did not do a side-by-side comparison of UC and UG machines when he spoke with Forsythe.  While he may not have completed a formal presentation on the differences between the two modules, Rockenbach did take the time to go through the purchase order and explain why the machines Forsythe was ordering would fit the criteria he specified.

The crux of Plaintiff's argument throughout this case has been that the mere use of the term "utility grade" ends any uncertainty as to which power module is the subject of discussion. For example, Plaintiff notes in its post-trial memorandum that the quote that Ring drafted contains the phrase "utility grade," Forsythe testified that he wanted "utility grade" power modules made by Caterpillar, and Schultz testified that Forsythe said he wanted utility grade power modules.  Even if that is true, however, the issue to be resolved is what the parties meant by the term "utility grade."  Forsythe testified that he wanted generators that could parallel with utilities and he wanted them as quickly as possible so that he could rent them to utilities during the power crisis.  The utility convertible generators–made specifically for rental applications and capable of paralleling with utilities–fit his requirements.  They were the types of generators that individuals in the industry, including Schultz and Forsythe, repeatedly referred to as utility grade.

Plaintiff presented evidence at trial that was intended to show that UC modules were inferior to UG modules, even when dealing with the rental market.  The overwhelming weight of

trial testimony indicates that Plaintiff is incorrect.  Caterpillar created the UC modules specifically for the purpose of rental applications that involved paralleling with utilities and those involved in the module rental market understood that to be the case, which is why it is not surprising that Schultz offered UC modules to Forsythe.

The uncompelling retelling of the discovery of the alleged breach reinforces the conclusion that Plaintiff's claim is without merit.  This Court does not find Forsythe-Fournier's testimony that she was aware of the breach, waited a month or two for Dominick to get her the systems data sheet, and then misplaced that sheet and requested another one months later to be credible.  This Court also does not find credible her testimony that she felt the best approach to the problem was to do a prolonged internet search about the machines.  Those machines cost the company more than $15 million.  The notion that an experienced businesswoman like Forsythe-Fournier would learn that her company had spent $15 million for what her employee said were the wrong machines and then take such a lackadaisical approach to resolving the problem is not believable, especially given her presentation at trial.  Moreover, Dominick testified that he received the systems data sheet within a day of requesting it from Fiorito so that he could provide it to Forsythe-Fournier right away.  That testimony is consistent with Fiorito's testimony that he faxed Dominick a copy of the sheet immediately after Dominick requested it and only faxed it once.  Based on the evidence presented at trial, this Court finds Dominick and Fiorito more credible than Forsythe-Fournier on the subject of the alleged discovery of the breach.  The evidence presented at trial strongly suggests that Forsythe-Fournier was not particularly surprised by the possibility that Plaintiff had acquired UC modules as opposed to UG modules.

To succeed in an action for contract reformation, a party must show, by strong, clear, and convincing evidence that there has been a meeting of the minds resulting in an actual agreement between the parties, that the parties agreed to reduce their agreement to writing, and, at the time that the agreement was reduced to writing and executed, some agreed upon provision was omitted or a provision not agreed upon inserted, either through mutual mistake or through mistake by one party and fraud by the other. *Alliance Syndicate, Inc. v. Parsec, Inc*., 741 N.E.2d 1039, 1048-1049 (Ill. App. Ct. 2000). Forsythe testified that he relied on Defendant to provide him with models that he could rent to utilities. The units that were provided met that requirement. Plaintiff did not prove that there was mutual mistake when the transaction was reduced to writing or that there was any fraud. Consequently, reformation is not an appropriate remedy .

## *CONCLUSION*

After carefully reviewing the evidence in this case, this Court concludes that judgment on both remaining counts will be entered in favor of Defendant. This case is CLOSED.

**Enter:**

**/s/ David H. Coar**

_____

**David H. Coar**
**United States District Judge**

**Dated: September 14, 2005**